In the Matter of The COMPLAINT OF FANTOME, S.A., International Maritime Resources, Inc., Windjammer Barefoot Cruises Ltd., and Michael Burke.

No. 99–0961–CIV.

United States District Court,
S.D. Florida,
In Admiralty.

Jan. 15, 2002.

Jerry Dean Hamilton, Houck Hamilton & Anderson, Miami, FL, James A. Cobb, Jr., John F. Emmett, New Orleans, LA, Patrick Edward Novak, Horr Novak & Skipp, Steven Craig Marks, Podhurst Orseck Josefsberg et al, Miami, FL, for plaintiffs.

Anna M. Scornavacca, William Turner Huggett, Huggett & Watford, Steven Michael Dunn, Dunn & Johnson, Miami, FL, Patricia Rose–Marie Cassells, De Cordoba & Cassells, Coral Gables, FL, Nicolas G. Sakellis, Miami, FL, for claimants.

### ORDER GRANTING PETITIONERS MOTION TO DISMISS ON THE ISSUE OF FORUM NON CONVENIENS AND DENYING CLAIMANTS' MOTION FOR SUMMARY JUDGMENT AS MOOT

LENARD, District Judge.

**THIS CAUSE** is before the Court on a Motion to Dismiss on the Issue of Forum Non Conveniens (D.E.79), filed August 10, 1999, by Petitioners Fantome, S.A., International Maritime Resources, Inc, ("IMR") Windjammer Barefoot Cruise, Ltd, and Michael Burke and a Motion for Summary Judgment on the Issue of Forum Non Conveniens (D.E.130), filed February 23, 2000, by Claimants Vernon W. Brusch, Constantine Hardware, Shirley Clarine Henry, Marsha Elizabeth King, Silvia C. Lizardo, Angelica Maria Lopez, Adela Canales Moreira, Michael Pierre, Boonfaye Herrera Saunders, Elizabeth E. Morain, Margaret George, Mavis Williams, Jose Nee Taylor Mason, Reno M. Mason, Pearla C. Phillips, Marlene White, Lynette Buxton, Rhonda Epperson and Shaieem Buxton. Both Motions are fully briefed and ripe for disposition. The parties dispute whether this Court is an appropriate forum in which to litigate the case. Because both Motions address the same legal issue, the Court discusses the parties' arguments while referring simultaneously to both Motions before the Court. Having reviewed the Motions, their corresponding pleadings, and the record, the Court finds as follows.

### I. Introduction

Claimants in this case are the family members of thirty-one deceased foreign crewmen who perished aboard the "SV Fantome," a 282–foot schooner, on or about October 27, 1998.[1] They are asserting "wrongful death" claims under the Jones Act, 46 U.S.C. § 688 (1982), and the Death on the High Seas Act, 46 U.S.C. § 761 (2000) *et seq.*, against the Fantome's owners, Petitioners International Maritime Resources, Inc. ("IMR"), Windjammer Barefoot Cruises, Ltd., Fantome, S.A., and Michael D. Burke.

---

1. None of the deceased crew members were citizens of the United States. Eleven were citizens of Guyana, four were citizens of St. Vincent, three were citizens of Jamaica, and two were citizens of Honduras. The remainder were citizens of Romania, Antigua, Trinidad, Great Britain, Nicaragua, St. Lucia, and Panama. (Burke Affidavit at § 29.)

Upon learning from the owners' base in Miami that "Hurricane Mitch," a category-five storm, was approaching, the Fantome discharged its passengers and non-essential crew in Belize. Claimants allege that the owners then negligently ordered the ship into the hurricane's path in a bid to outrun the storm en route to Honduras. Petitioners deny any negligence on their part and argue that the hurricane unpredictably changed course.

Petitioners now file a Motion to Dismiss in which they argue that this Court lacks jurisdiction on the basis of forum non conveniens. After establishing the procedural history, the factual background, and the standard of review in this case, the Court finds that this case should be dismissed on the basis of forum non conveniens.

## II. Procedural History

On April 2, 1999, Petitioners filed their Complaint and Petition for Limitation or Exoneration of Liability in federal court. On August 10, 1999, Petitioners filed a Motion to Dismiss under the Doctrine of Forum Non Conveniens. (D.E.79.) On April 10, 2000, Claimant's filed a Response to Petitioners' Motion to Dismiss under Doctrine of Forum Non Conveniens. (D.E.164.) On July 25, 2000, Petitioners filed a Joint Reply in Support of Motion to Dismiss under the Doctrine of Forum Non Conveniens. (D.E.189.) On February 23, 2000, Claimant's filed a Motion for Summary Judgment on the Issue of Forum Non Convenience. (D.E.130.) On March 6, 2000, Petitioners filed a Joint Response to Motion for Summary Judgment on the Issue of Forum Non Conveniens. (D.E. 132.) On April 4, 2000, Claimants filed a Reply to Petitioners' Response to Claimants' Motion for Summary Judgment. (D.E.158.) As both parties filed affidavits and other materials in support of and in opposition to the Motion to Dismiss, the Court construes it as a Motion for Summary Judgment.

## III. Factual Background

The following facts are not in dispute. The Fantome was a member of the Windjammer fleet, whose vessels sail in the Caribbean and operate as cruise ships. The Windjammer fleet is owned entirely by Miami-residents Captain Michael Burke and his six children. (*See* Pets.' Joint Reply Mot. Dismiss at 5.) Each vessel within the Windjammer fleet is owned by a separate foreign corporation bearing its name. (*See* Burke Dep. at 7.) At the time of the Fantome's disappearance, the ship was owned by Fantome, S.A., a company incorporated in Panama which sailed under the country flag of Equatorial Guinea in Western Africa. (*See id.*) Captain Burke is the principal shareholder in Fantome, S.A. (*See* Pets.' Joint Resp. Mot. for Summ. J. at 7.) The members of the Burke family are the sole shareholders of the defendant corporations in this case. (*See* Pets.' Joint Reply Mot. Dismiss at 5). Each member of the family is a United States citizen, and all Windjammer offices are located in Miami Beach. (*See id.*; Burke Dep. at 4.)[2]

**2.** The Court is entitled to look beyond the pleadings on this motion to dismiss because the existence of subject matter jurisdiction has been attacked, in fact. As the Eleventh Circuit has noted,

> Attacks on subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1) come in two forms. 'Facial attacks' on the complaint 'require[ ] the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allega-

tions in his complaint are taken as true for the purposes of the motion.' *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir.) ... 'Factual attacks,' on the other hand, challenge 'the existence of the subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered.' (*Id.*)

*Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir.1990).

IMR, a Florida corporation, is the operating agent for the Windjammer fleet and was responsible for facilitating the operations of the Fantome. (*See* Burke Dep. at 45). The president of IMR is Michael D. Burke, the son of Captain Michael Burke. (*See* Burke Dep. at 4.) Windjammer Barefoot Cruises, Ltd., handles advertising, reservations, and sales for the fleet. (*See* Epperson Dep. at 15.) Captain Burke's daughter, Susan Burke Pigna, is the company's president. (*See* Burke Dep. at 4.)

The Fantome, like that of the other ships in the Windjammer fleet, operated such that the ship never landed in a U.S. port. The company's Miami office communicated with the Windjammer fleet via satellite phone, fax, and computer, but most of the ship's day to day operations and repairs occurred at various locations in the Caribbean where the ship made port. While in Honduras, for example, a Honduran agent conducted "arrangements for transportation for passengers to and from the ship," managed "excursions [for passengers] during the period the ship was in port" and assisted with "provisioning the ship, arranging for water, berthage, fuel, clearance." (Burke Dep. at 23–24.) Provisions were also supplied at sea by another Windjammer ship, "MV The Amazing Grace" (Epperson at 49–50), and repairs were conducted on board by the ship's mechanics. (Epperson Dep. at 50.) Employees were hired in various foreign ports and their contracts were signed and kept aboard ship. (Burke Dep. at 24.)

## IV. Analysis

### A. The Standard for Dismissal under Forum Non Conveniens

In deciding whether this case should be dismissed under the doctrine of forum non conveniens, the Court is initially faced with the choice-of-law question of whether United States law is applicable to this action. The Eleventh Circuit clearly requires that if U.S. law is found to be applicable, a case may not be dismissed on forum non conveniens grounds. *See Szumlicz v. Norwegian America Line*, 698 F.2d 1192, 1195 (11th Cir.1983). In *Szumlicz*, the court held that:

> If U.S. law applies, the action should not be dismissed on the basis of forum non conveniens. If the court determines that United States law does not apply, it then examines the traditional considerations of forum non conveniens to determine whether the court should exercise its discretion and decline to assert jurisdiction over the case. *Volyrakis v. MV ISABELLE*, 668 F.2d 863 (5th Cir.1982); *Chiazor v. Transworld Drilling Co., Ltd.*, 648 F.2d 1015 (5th Cir.1981).

*Szumlicz*, 698 F.2d at 1195.

Re-emphasizing this point, the *Szumlicz* Court ruled that "if United States law is applicable, the American court should retain jurisdiction rather than relegate the controversy to a foreign tribunal," *Szumlicz*, 698 F.2d at 1195 (citing *Fisher v. Agios Nicolaos V*, 628 F.2d 308, 316 (5th Cir.1980)).[3]

As a result, it is necessary for this Court to determine the applicability of the U.S. laws alleged to have been violated. Specifically, do the Jones Act and the Death on the High Seas Act govern the facts in this matter? The Jones Act states, in pertinent part, that:

> "Any seaman who shall suffer personal injury in the course of his employment may at his election, maintain an action for damages at law, with the right of trial by jury ... and in case of the death

---

**3.** The Eleventh Circuit held in *Bonner v. Prichard*, 661 F.2d 1206 (11th Cir.1981), that decisions rendered prior to the close of business on September 30, 1981 by the United States Court of Appeals for the Fifth Circuit (the "former Fifth" or the "old Fifth") shall be binding as precedent in the Eleventh Circuit.

of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury ... Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located."

46 App. U.S.C. § 688 (1982).

The Death on the High Seas Act states that:

whenever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas beyond a marine league from the shore of any State, or the District of Columbia, or the Territories or dependencies of the United States, the personal representative of the decedent may maintain a suit for damages in the district courts of the United States, in admiralty, for the exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative against the vessel, person, or corporation which would have been liable if death had not ensued.

46 App. U.S.C. § 761 (2000). As a number of courts have noted, the broad language of these acts could apply to virtually any seaman anywhere in the world. *De Mateos v. Texaco, Inc.*, 562 F.2d 895, 900 (3rd Cir.1977).

The Supreme Court, however, has significantly limited the reach of the Jones Act in *Lauritzen v. Larsen*, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), which holds that the applicability of U.S. law depends on seven choice of law factors. These include: (1) the place of the wrongful act, (2) the law of the ship's flag, (3) the allegiance or domicile of the injured seamen, (4) the allegiance of the shipowner, (5) the place where the shipping articles were signed, (6) the accessibility of the foreign forum, and (7) the law of the forum. *Lauritzen*, 345 U.S. at 583–591, 73 S.Ct. 921. Although the case law indicates that the test is not a "mechanical one" to be arrived at by simply adding up the factors (*Rhoditis*, 398 U.S. at 306, 90 S.Ct. 1731), *Lauritzen* itself places varying degrees of emphasis on these various factors.

The court subsequently added another important criteria, the "base of operations" factor, in *Hellenic Lines v. Rhoditis*, 398 U.S. 306, 310, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970). These factors, the Court held, are not to be applied "mechanical[ly]" but rather in light of the totality of the circumstances, *Rhoditis*, 398 U.S. at 308, 90 S.Ct. 1731. In *Rhoditis*, 398 U.S. at 310, 90 S.Ct. 1731, the Court held that the existence of a U.S. base of operations required the applicability of the Jones Act in that case. The Court made this ruling even though almost all of the other *Lauritzen* factors favored dismissal. *See Rhoditis*, 398 U.S. at 310, 90 S.Ct. 1731.

The lawsuit in *Rhoditis* was brought under the Jones Act by a Greek seaman injured on board a Greek ship docked at the Port of New Orleans. *Rhoditis*, 398 U.S. at 308, 90 S.Ct. 1731. The vessel was owned by a Greek corporation, whose owner was a Greek citizen, residing in the United States. *See id.* The ship sailed under a Greek flag, and the injured seaman's contract, which was signed in Greece, provided that Greek law apply to disputes between the seaman and the employer. *See id.* The contract also provided that any such disputes are to be adjudicated in a Greek court. *See id.*

Despite this panoply of factors favoring dismissal under *Lauritzen*, the *Rhoditis* Court held that the list in Lauritzen was "not exhaustive" and added another factor "of importance," the ship's U.S. base of operations. *Rhoditis*, 398 U.S. at 309, 90 S.Ct. 1731. The Court further held that the "base of operations" was, in fact, in the United States on the grounds that (1) the owner, who held ninety-five percent of the

stock, was a U.S. domiciliary and (2) the ship was not a "casual visitor" to New York but rather earned "income from cargo originating or terminating here." *Rhoditis,* 398 U.S. at 310, 90 S.Ct. 1731. As the *Rhoditis* court explained,

> The flag, the nationality of the seaman, the fact that his employment contract was Greek, and that he might be compensated there are in the totality of the circumstances of this case minor weights in the scales compared with the substantial and continuing contacts that this alien owner has with this country... [T]he facade of the operation must be considered minor, compared with the real nature of the operation and a cold objective look at the actual operational contacts that this ship and this owner have with the United States.

*Id.*

Relying on *Rhoditis,* the Eleventh Circuit held in *Szumlicz* that the substantial

use of a United States "base of operations" by the vessel's owner, along with any other U.S. contacts, justified the application of the Jones Act and, thus, precluded dismissal on the basis of forum non conveniens. *Szumlicz,* 698 F.2d at 1195. As in *Rhoditis,* the *Szumlicz* court reached this conclusion even though almost all of the other *Lauritzen* factors favored the defendant. *Szumlicz,* 698 F.2d at 1196. In *Szumlicz,* the nationality of the flag was Norwegian, the "place of the contract" was Norway and Germany, "the forum" and "law of the forum" were Norwegian, and the "place of the wrongful act" was in international waters. *Id.* Thus, the Eleventh Circuit has placed significant weight on the *Rhoditis* base of operations test where, despite the facade of foreign management, the ship and the shipowner have close operational contacts with the United States.[4]

---

**4.** Petitioners "seriously question" whether the application of U.S. law bars forum non conveniens claims under *Szumlicz* in light of other circuits' interpretation of *Piper Aircraft v. Reyno,* 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). Petitioners rely heavily on *In re Air Crash Disaster Near New Orleans, La.,* 821 F.2d 1147 (5th Cir.1987), in which the Fifth Circuit decided to overrule Jones Act and maritime case law which employ a choice of law analysis in forum non conveniens cases. That case, which is not binding on this Court, held that the application of a choice of law analysis was inconsistent with *Piper's* pronouncement that "[t]he possibility of a change in substantive law should ordinarily not be given conclusive or even substantial weight in the forum non conveniens inquiry." *Piper,* 454 U.S. at 247, 102 S.Ct. 252.

In *Piper,* however, the Court addressed the specific question of whether plaintiffs should be able to defeat a motion on the ground of forum non conveniens by showing that an alternative forum's substantive law is less favorable to the plaintiffs. *See id.* Moreover, *Piper* did not address Jones Act and Maritime cases in which choice of law issues have been held to be dispositive on the issue of forum

non conveniens. It is also unclear under *Piper* whether the Court would consider the long line of Jones Act and Maritime cases an area where "a change in substantive law" should be given weight.

Like the Eleventh Circuit, the Ninth and Tenth Circuits have also not changed their position since the Supreme Court's ruling in *Piper. See Zipfel v. Halliburton Co.,* 832 F.2d 1477, 1486 (9th Cir.1987), cert. denied, 486 U.S. 1054, 108 S.Ct. 2819, 100 L.Ed.2d 921 (1988), (holding that forum non conveniens may not be used to dismiss case if federal statute with specific venue provision applies); *Needham v. Phillips Petroleum Co.,* 719 F.2d 1481, 1483 (10th Cir.1983) (holding that application of U.S. law bars dismissal on basis of forum non conveniens). The Supreme Court has denied certiorari in *Zipfel* and allowed this split among the circuits to stand. Thus, the Eleventh Circuit's holding in *Szumlicz* is still binding on this Court.

As this Court ultimately finds that U.S. law does not apply, it bases its ruling on the forum non conveniens factors in *Piper* as well as on the inapplicability of U.S. law to this dispute.

If it is determined that U.S. law applies, a district court in this Circuit is precluded under *Lauritzen, Rhoditis,* and *Szumlicz* from dismissing the case on the basis of forum non conveniens. If, however, the court finds that U.S. law does not apply, it must then analyze the appropriateness of the United States as a forum under the forum non conveniens factors established by *Piper Aircraft v. Reyno,* 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981) and *Gulf Oil v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). This inquiry requires the court to determine whether (1) an available and adequate foreign forum exists and to consider (2) private and public interest factors weighing in favor of or against dismissal. The private interest factors include: (1) the relative ease of access to sources of proof, (2) the availability of compulsory process for attendance of unwilling witnesses and costs of obtaining willing witnesses, (3) the probability of a view of the premises, if appropriate to the action, (4) the enforceability of a judgment if obtained, and (5) all other practical problems that make trial of the case easy, expeditious, and inexpensive. *Air Crash,* 821 F.2d at 1147. The public interest factors include: (1) administrative difficulties flowing from court congestion, (2) local interest in having localized controversies resolved at home, (3) the interest in having the trial of a diversity case in a forum that is familiar with the law governing the action, (4) the avoidance of unnecessary problems in conflicts of law or in the application of foreign law, and (5) the unfairness of burdening citizens in an unrelated forum with jury duty. *Id.*

None of these factors is controlling and the "forum non conveniens determination is committed to the sound discretion of the trial court. It may be reversed only when there has been a clear abuse of discretion; where the court has considered all relevant public and private interest factors, and

where its balancing of these factors is reasonable, its decision deserves substantial deference." *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.,* 119 F.3d 935, 951 (11th Cir.1997), quoting *Piper Aircraft Company v. Reyno,* 454 U.S. 235, 257, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981).

### B. Application of the Choice of Law Analysis

Applying the Lauritzen–Rhoditis–*Szumlicz* line of holdings to the facts *sub judice,* it is clear that U.S. law does not govern this matter. The Court will apply to the facts of this case each of the seven *Lauritzen* factors and the *Rhoditis* gloss on these factors, contained in the base of operations test.

### 1. The Place of the Wrongful Act

According to Petitioners, the place of the wrongful act is the unknown location where the ship disappeared, either in international waters or off the coast of Honduras. (*See* Pets.' Joint Resp. Mot. Summ. J. at 9.) Claimants, however, argue that the place of the wrongful act in this particular case was Miami, Florida, where the "order" was given to try to outrun the hurricane. (Claimnts' Mot. Summ. J. at 6). Petitioners suggest this factor is generally of minimal significance because "the location of highly mobile ships is often fortuitous." (Pets' Joint Resp. Mot. Summ. J. at 9, citing *Quintero v. Klaveness Ship Lines,* 914 F.2d 717 (5th Cir. 1990)). Although the location of ships may be fortuitous with respect to negligent acts occurring on board, Claimants allegations are based upon an allegedly negligent order given from Miami. (Claimnts' Resp. Mot. Dismiss at 5–6). Indeed, Petitioners concede that Captain Michael Burke and the Fantome's captain had a conversation in which they "agreed" that they could not stay in the path of the storm. (Burke

Dep. Ex.2 at 3). While this conversation may have involved a order to outrun the storm, this decision may also have been ultimately made by the captain. As the place of the wrongful act is patently unclear, this factor favors neither party in this analysis.

## 2. The Law of the Ship's Flag

The nationality of the flag in this case is the African country of Equatorial Guinea. Although the flag can be decisive in a given case, see *Rhoditis*, 398 U.S. at 308, 90 S.Ct. 1731, the flag in this case was clearly a flag of convenience. Equatorial Guinea bears no relationship to this ship or this case. As a result, both parties concur, and the Court finds, that the flag should be disregarded as a factor. (*See* Pets.' Resp. Mot. Summ. J. at 9–10.)

## 3. The Allegiance or Domicile of the Injured Seamen

The allegiance of the thirty-one deceased seamen in this case correspond to eleven different foreign countries and, thus, clearly favor Petitioners. In *Sigalas v. Lido Maritime*, the Eleventh Circuit clearly opined that "[t]his Court has found that the plaintiff's domicile to be especially significant in choice of law analysis." *Sigalas v. Lido Maritime*, 776 F.2d 1512, 1517 FN 6 (11th Cir.1985), citing *Symonette Shipyards, Ltd. v. Clark*, 365 F.2d 464, 467 (5th Cir.1966) ("Each nation has a legitimate interest that its nationals and permanent inhabitants be not maimed or disabled from self-support.")

## 4. The Allegiance of the Shipowner

Petitioners argue that the allegiance of the shipowner is in Panama due to Fantome, S.A.'s incorporation in that country. At the same time, they concede that the stock of the defendant corporations is entirely owned by United States citizens. (*See* Pets' Joint Reply Mot. to Dismiss at 5.) Petitioners argue that *Lauritzen* looks only to the "nationality of the corporate shipowner" and not to the nationality of the shareholders. (Joint Resp. Mot. Summ. J. at 10–11). *Lauritzen*, however, notes that courts have pressed beyond "formalities of more or less nominal foreign registration to enforce against American shipowners the obligations which our law places upon them." *Lauritzen*, 345 U.S. 571, 587, 73 S.Ct. 921, 97 L.Ed. 1254.[5] The desirability of looking beyond corporate formalities to the nationality of the shareholders is also included as an element of the *Rhoditis* base of operations factor.[6] Hence, the allegiance of the shipowner is to the United States.

## 5. The Place of the Contract

In *Lauritzen*, the Court placed minimal emphasis on the place of the contract, noting that with regard to sailor's contracts:

> the place of contracting ... as is usual to such contracts [is] fortuitous. A seaman take his employment, like his fun, where he finds it; a ship takes on crew in any port where it needs them. The practical effect of making the *lex loci contractus* [the law of the place of the contract] govern all tort claims during

---

**5.** The allegiance of the shipowner was never seriously in question in *Lauritzen*, however, because the shipowner was both "a Dane by nationality and domicile." *Id.* at 588, 73 S.Ct. 921.

**6.** Petitioners suggest that the term shipowner, as used in *Lauritzen,* is somehow different

from shareholder. (*See* Pets.' Resp. Mot. Summ. J. at 11.) That distinction is not drawn in *Lauritzen.* Furthermore, the *Rhoditis* Court declared a Greek national domiciled in the U.S. to be the true shipowner because he was a shareholder who held ninety-five percent of the stock. *Rhoditis*, 398 U.S. at 307, 90 S.Ct. 1731.

the service would be to subject a ship to a multitude of systems of law, to put some of the crew in a more advantageous position than others, and not unlikely in the long run to diminish hirings in ports of countries that take best care of their seamen. But if contract law is nonetheless to be considered ... the tendency of the law is to apply in contract matters the law which the parties intended to apply.

*Lauritzen*, 345 U.S. at 588–589, 73 S.Ct. 921. *Lauritzen* thus places greater emphasis on the intent of the parties than on the actual place of the contract.

The "place of the contract" in this instance was on board the Fantome, as seamen signed their contracts when hired aboard ship in foreign ports. With regard to the intent of the parties, Petitioners claim that the contracts specified that the agreement was to be governed by the law of the country "into which waters the vessel shall sail." (Pets.' Mot. Dismiss at 4.) At times, Petitioners claim Honduran law applies because the ship went down in Honduran waters; at other times they state the ship sank in international waters. (*See* Pets.' Mot. Dismiss at 4 & 5). The applicable location and thus "intent" is therefore unclear. As it is also unknown what the contracts actually stated because they went down with the ship, the Court holds that the "place of the contract" is not entitled to significant weight in this analysis.

### 6. The Inaccessibility of the Foreign Forum

As discussed below in Section IV.C.1, the Court finds that an adequate alternative foreign forum is accessible in Panama and that this factor, therefore, favors Petitioners.

### 7. The Law of the Forum

The "law of the forum" refers to the applicable law within the United States. The Fifth Circuit has ruled this factor inapplicable where the defendant is involuntarily made a party. *Sosa v. MV LAGO IZABAL*, 736 F.2d 1028 (5th Cir.1984). In this case, Petitioner's filed a Complaint and Petition for Limitation or Exoneration of Liability in federal court after being sued in state court. Thus, although *Rhoditis*, properly suggests that the law of the forum (i.e., the Jones Act) is to be given a liberal construction to effect its purposes, *Rhoditis*, 398 U.S. at 308–309, 90 S.Ct. 1731, the issue is not relevant to this case.

### 8. The *Rhoditis* Base of Operations Factor

In *Rhoditis*, 398 U.S. at 310, 90 S.Ct. 1731, the Supreme Court added the ship's "base of operations" as an eighth factor to those listed in *Lauritzen*, stressing the need to look beyond corporate formalities in order to determine the ship and the shipowner's operational contacts with the United States.

If ... the liberal purposes of the Jones act are to be effectuated, the facade of the operation must be considered as minor, compared with the real nature of the operation and a cold objective look at the actual operational contacts that this ship and this owner have with the United States.

*Rhoditis*, 398 U.S. at 310, 90 S.Ct. 1731 (citing *Bartholomew v. Universe Tankships, Inc.*, 263 F.2d 437).

While the shipowners in this case clearly had strong ties to the United States, the operational contacts between the ship and this country are not particularly significant. Although the Fantome was incorporated in Panama, this corporate formality does not veil the fact that the Windjammer fleet is owned by the Burke family, which

holds one hundred percent of the shares in the defendant corporations. (*See* Pets.' Joint Reply Mot. Dismiss at 5.) These owners are all U.S. citizens, living and residing in Miami. (*Id.*) Similarly, all of the Windjammer fleet's offices are located in one office building in Miami Beach. (*See* Burke Dep. at 4.) Accordingly, the shipowners in this case clearly maintain close operational ties with the United States.

In contrast to the ships in *Rhoditis* and *Szumlicz*, however, the Fantome did not operate between the United States and foreign ports. In fact, the ship never made port in the United States. As the ship's day to day operations and repairs had to take place at the various locations in the Caribbean where it docked, the ship had numerous "bases" of operations at the ports where it took on passengers, supplies and new crew members. Not surprisingly, these activities were carried out with the help of individuals in these various foreign ports. In Honduras, for example, a Honduran agent assisted with "provisioning the ship, arranging for water, berthage, fuel, [and] clearance." (Burke Dep. at 23–24.) Repairs were similarly conducted by on-board mechanics in various foreign ports, where additional personnel and crew were hired and utilized. (Epperson Dep. at 50.)

The presence of Defendants' offices in Miami similarly does not suggest that this was the Fantome's "base of operations." In *Villar v. Crowley Maritime Corp.*, 782 F.2d 1478 (9th Cir.1986), the Ninth Circuit specifically found that the presence of defendant's headquarters in the district did not place the vessel's "base of operations" in that district. Notably, the *Villar* court distinguished the ship's operational contacts with the United States from those in *Rhoditis* on the basis that the ship in *Villar* never made port in the United States whereas the ship in *Rhoditis* regu-larly traveled between New York and foreign destinations. In *Rhoditis*, the Court essentially found that the ship's "base of operations was in New York [because] [t]he Hellenic Hero was not a casual visitor; [but] rather it and many of its sister ships were earning income from cargo originating in or terminating here." *Rhoditis*, 398 U.S. at 310, 90 S.Ct. 1731. Likewise, the ship in *Szumlicz* "operated on a regular basis out of Port Everglades in Fort Lauderdale." *Szumlicz*, 698 F.2d at 1194. The Fantome, however, like the vessel in *Villar*, did not travel between the United States and foreign destinations, and, in fact, never made port in this country.

A U.S. district court in this District similarly distinguished *Rhoditis* and *Szumlicz* on the basis that the base of operations factor did not apply because the ship in question did not call on U.S. ports. *Baydar v. Renaissance Cruises, Inc.*, 35 F.Supp.2d 916, 918. Moreover, the court made this finding despite the fact that "Defendant's office is located in Fort Lauderdale and ... its officers live in Florida." *Id.*

Hence, although the shipowners in this case clearly have strong ties to the United States, the operational contacts between the ship and the United States do not merit a finding that the ship had its base of operations in this country.

In sum, the Court finds on these facts that the *Lauritzen–Rhoditis* analysis militates against the application of U.S. law. As noted above, a number of these eight factors are not entitled to significant weight either due to the weight ascribed to them by the case law or in the context of this case. These include the place of the wrongful act, the law of the flag, the place of the contract and the law of the forum. Among the remaining factors, the Court finds that, taken together, the domicile of

the injured seamen (which the Eleventh Circuit has described as "especially significant"),[7] the accessibility of a foreign forum and the absence of a U.S. base of operations clearly outweigh the U.S. domicile of the shipowner. As a result, the Court finds on the basis of the *Lauritzen–Rhoditis* analysis that U.S. law does not apply in the context of this case.

## C. Application of Forum Non Conveniens Factors

 Having determined that U.S. law does govern this case, the Court is now required to analyze the appropriateness of the United States as a forum. A party moving to dismiss on the basis of forum non conveniens must demonstrate that (1) an adequate, available foreign forum exists and (2) that the various private and public interest factors weigh in favor of dismissal. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947) and *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981).

### 1. Available and Adequate Forum

The burden of demonstrating that an adequate, alternative forum exists is not a heavy one. As the Eleventh Circuit explained in *Republic of Panama*, "[g]enerally, a defendant satisfies the first [availability] prong of the analysis by showing that it is 'amenable to process in the other jurisdiction.'" *Republic of Panama*, 119 F.3d at 951, quoting *Piper*, 454 U.S. at 254 n. 22, 102 S.Ct. 252.

Articles 17 and 18 of the Panamanian Maritime Law confer jurisdiction to Panamanian Maritime Courts to hear personal injury and death cases involving corporations domiciled in Panama. (Reply Supp. Mot. Dismiss at 2; Ex. 1, Gallardo Affidavit at 2.) As Fantome, S.A. and its President Hernandez Obaldia and Treasurer Mr. Roberto Rios are domiciled in Pana-

ma, the Panamanian court may serve process personally. *Id.* Panamanian law is also unconcerned with the domicile of the Petitioners and focuses instead on the ability to serve process on the defendant corporation. *Id.* Courts are also competent to hear such cases under Articles 17(3) and (4) of the Panamanian Procedural Code where the "parties have submitted expressly or tacitly to the jurisdiction of the Maritime Courts of the Republic of Panama." Procedural Code of Panama Articles 17(3) and (4).

Petitioners have agreed to consent to the jurisdiction of the Panama court system, to not raise any statute of limitations defenses, to appear without necessity of subpoena, to instruct its employees appear before the court and to bear any expenses related to the employees's attendance. (Petitioners' Supplemental Mem. Dismissal For. Non Conveniens, D.E. 259, at 2.) Given these concessions, Panama clearly constitutes an available alternative forum. Where a defendant consents to the jurisdiction of a foreign court, Defendant's amenability to suit is not an issue. *Magnin v. Teledyne Continental Motors*, 91 F.3d 1424, 1429 (11th Cir.1996). *Jota v. Texaco*, 157 F.3d 153, 159 (2nd Cir.1998).

Claimants argue that the pertinent statute of limitations under Panamanian law has expired and cannot be waived by the parties. (Claims' Mem. Opp. Pets.' Mot. Dismiss, D.E. 260, filed November 24, 2001, at 3.) In support of this position, Claimants submit the affidavit of Jorge E. Illueca, which states that Article 73 of the Code of Maritime Procedure prevents "any advance waiver by stipulation between the parties of the right to assert the motion to dismiss pursuant to a statute-of-limitations bar shall have no effect on the action." (Claimnts.' Notice of Filing Panamanian Legal Authorities in Opp. Pet. Mot. to

---

**7.** *Sigalas v. Lido Maritime*, 776 F.2d at 1517 FN6

Dismiss, D.E. 262, at 11.) According to Petitioners' legal expert, Eric Britton, however, Mr. Illueca failed to note that under the doctrine of "excepciones de prescripcion" (defenses of statute of limitations) parties may frequently agree to waive the statute of limitations irrespective of Article 73. Specifically, he notes that Article 693 of the Panamanian Procedural Code strictly prohibits courts in that country from raising statute of limitations defenses unless they are raised by the parties.

> Article 693. When the judge finds proven all facts that constitute an exception [defense], even if it has not been raised or alleged, he must recognize it in the judgment ... and must rule in accordance with the exception [defense] being recognized; Nonetheless, in regard to the exceptions [defenses] of statute of limitations and compensation, it is necessary that they be raised.

If Petitioners agree not to raise the statute of limitations defense and the case is brought within a Panamanian maritime jurisdiction, a Panamanian court will be competent to hear the case under 17(3) and (4) of the Panamanian Maritime Procedural Code. As Petitioners have agreed to not raise this defense, Claimants are not precluded from bringing this action in Panama, which is an available forum.

Panama's legal system also provides an adequate forum. Panama allows for recovery of pain and suffering, loss of support, expenses and loss of consortium. (Reply Supp. Mot. Dismiss at 2; Ex. 1, Gallardo Affidavit at 3.) Thus, it is by no means clear that Panama would be a less favorable forum. Moreover, the fact that the substantive law of the alternative forum may be less favorable to the plaintiff does not render the alternative forum inadequate. *Piper*, 454 U.S. at 247, 102 S.Ct. 252. A change in substantive law only becomes a consideration when "the reme-dy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all." *Id.*, 454 U.S. at 254, 102 S.Ct. 252.

The question next arises whether Panamanian law would apply if suit is commenced in Panama. Although under Article 557 of the Panamanian Maritime Code the law of the flag governs disputes between shipowners and seamen, the Court will apply its own law where, as here, the flag state does not provide a meaningful remedy. (Reply Supp. Mot. Dismiss at 2; Ex. 1, Gallardo Affidavit at 4.) As Equatorial Guinea would clearly not provide an adequate remedy, the Panamanian court would be required to apply Panamanian law, which applies adequate remedies. Furthermore, Petitioners have agreed to stipulate that Panamanian law will apply to this dispute. (*Id.* at 5.) As such, the Court finds that Panama provides an available and adequate forum. The Court next turns its attention to an analysis of the private and public interest factors.

### 2. Private Interest Factors

Private interest factors are those considerations which affect the convenience of the litigants. These factors include: (1) relative ease of access to sources of proof, (2) availability of compulsory process for attendance of unwilling witnesses and costs of obtaining willing witnesses, (3) probability of view of premises, if appropriate to the action, (4) the enforceability of a judgment if obtained, and (5) all other practical problems that make a trial of the case easy, expeditious, and inexpensive. *Air Crash*, 821 F.2d at 1147.

### a. Relative Ease of Access to Sources of Proof

All of the Claimants in this case are foreign nationals, the majority of whom will be testifying as to the magnitude of

the loss they have sustained. With regard to the issue of liability, the surviving crew members who disembarked in Belize are all foreign nationals, as are the former masters and officers of the Fantome with one exception. (Mem. Mot. Dismiss, Affidavit of Michael Burke at 4.) Only a few witnesses appear to be located in the United States, and Petitioners have stipulated that they will pay the expenses of these witnesses, who will submit to foreign jurisdiction without subpoena. Although much of the documentary evidence in this case is located in the United States, Petitioners have stipulated that they will produce all relevant documentation requested at their expense and bear the cost of translation. (Reply Mot. Dismiss at 2.) Hence, the Court finds that this factor favors Petitioners on balance.

### b. Availability of Compulsory Process

No one forum, including the United States, could subject all of the witnesses in this case to compulsory process. Petitioners have stated that Michael and Susan Burke will submit to foreign jurisdiction without subpoena and pay the expenses of their employees located in the United States who they will require to testify at trial. As a result of these concessions, the availability of compulsory process is essentially the same in either Panama or Miami, while the costs may be lower given that most of the witnesses are closer to Panama than to Miami.

### c. Probability of View of the Premises

As the precise location of the Fantome at the time of its disappearance is unknown, this factor is inapplicable to this analysis. Should a court decide that it is necessary to view the island near Honduras where the Fantome last took shelter, this location is considerably closer to Panama than to the United States.

### d. Enforceability of Judgment If One Is Obtained

Petitioners have stipulated that dismissal may be conditioned upon the depositing of a limitation fund in an escrow account in Panama to satisfy any judgment rendered against Fantome. As such, a judgment by a Panamanian court would clearly be as enforceable as a judgment issued from this court.

### e. All Other Practical Problems

The conduct of a trial involving an accident overseas causing the death of 31 foreign nationals clearly raises a large number of practical problems. A great deal of discovery will involve taking the testimony of individual claimants from these various countries. While many of these difficulties will be involved in a trial held in Panama, these events occurred in closer proximity to Panama than to the United States.

### 3. Public Interest Factors

Public interest considerations in forum non conveniens analysis are concerns that affect the convenience of the competing fora. These factors include: (1) administrative difficulties flowing from court congestion, (2) local interest in having localized controversies resolved at home, (3) the interest in having the trial of a diversity case in a forum that is familiar with the law governing the action, (4) the avoidance of unnecessary problems in conflicts of law or in the application of foreign law, and (5) the unfairness of burdening citizens in an unrelated forum with jury duty. *Air Crash*, 821 F.2d at 1147. Even where the convenience of the litigants is nearly in balance, the district court retains discretion to dismiss the action upon finding that (a) foreign law will likely predominate, (b) the dispute would unduly burden the community or (c) that there is no public interest in the dispute. *Pain v. United Tech-*

*nologies Corp.*, 637 F.2d 775, 791 (D.C.Cir. 1980); *Sigalas v. Lido Maritime*, 776 F.2d 1512, 1520.

### a. Administrative Difficulties Flowing from Court Congestion

This case would likely consume significant judicial time and attention in the United States District Court for the Southern District of Florida, which has one of the busiest dockets in the country. Considering that the incident and parties are so remotely connected to the United States, U.S. courts have an interest in not expending judicial resources on this matter.

### b. Local Interest in Having Localized Controversies Resolved at Home

The instant matter cannot be reasonably characterized as a local controversy. This accident occurred far from U.S. waters, the vessel never called in a U.S. port, and none of the deceased crew members was a U.S. citizen. Neither the location of the defendants' home office in the district nor actual United States ownership of the defendant are dispositive. *Warn v. M/Y Maridome*, 169 F.3d 625 (9th Cir.1999.) As the presence of two defendant corporations in this country is insufficient to create a local interest in this controversy, neither country has a predominant interest with respect to this factor.

### c. Interest in Having Case Tried in Forum Familiar with Governing Law

As the Court has already determined that U.S. law does not govern this case on the basis of the *Lauritzen–Rhoditis* choice of law analysis, the Court would be obliged to apply foreign law in this case and may even be required to apply the law of several nations. Such application of foreign law would burden both the Court and the parties who would be required to retain for-

eign law experts to establish the rights and remedies available to the litigants. The Court would also be required to determine quantum under applicable foreign law, which would also impose an undue burden on the Court. *Bhatnagar v. Surrendra Overseas, Ltd.*, 52 F.3d 1220 (3rd Cir.1995)(holding that award under Indian law must be commensurate with awards in Indian courts). As a result, no issues of governing law exist which favor trying this case in the United States.

### d. Avoidance of Unnecessary Conflicts of Law and Foreign Law Problems

As discussed in the above subsection, myriad unnecessary conflicts of law and foreign law problems may arise as a result of trying this case in the United States. The Eleventh Circuit and U.S. Supreme Court have noted that this factor is particularly important, holding that "unless there is some idiosyncracy in the facts of a case to be resolved under foreign law, it should be dismissed in favor of a foreign tribunal." *Sigalas*, 776 F.2d at 1520, citing *Piper*, 454 U.S. at 251, 102 S.Ct. 252.

### e. Unfairness of Burdening Citizens in an Unrelated Forum with Jury Duty

The United States has minimal interest in resolving a dispute where U.S. law does not apply, none of the deceased crew members were U.S. citizens, the accident occurred far from U.S. waters, and involved a vessel which never called in a U.S. port. As such, it would be inappropriate to require U.S. citizens to sit as jurors in a case in which the United States has little interest.

### V. Conclusion

Having considered the inapplicability of U.S. law, the availability of an adequate

foreign forum and the balance of all relevant private and public interest factors, the Court finds that this case should be dismissed in favor of Panama on the basis of forum non conveniens. The Court, however, conditions its dismissal of this case upon Petitioners' acceptance of the below enumerated stipulations. Accordingly, it is

**ORDERED AND ADJUDGED that:**

(1) Petitioner's Motion to Dismiss Under the Doctrine of Forum Non Conveniens (D.E.79), filed August 10, 1999, which the Court construes as a Motion for Summary Judgment, is **GRANTED**, subject to the following conditions.

(2) All Petitioners shall consent to the jurisdiction of the Panamanian courts.

(3) All Petitioners agree not to raise any applicable statute of limitations defenses to any action instituted by Claimants.

(4) All Petitioners shall consent to the enforcement of any final Panamanian judgment against it in the United States.

(5) All Petitioners shall voluntarily produce all relevant documents, and bear the costs of translation. All discovery that takes place in the United States shall be conducted in accordance with the procedures established by the Federal Rules of Civil Procedure of the United States.

(6) Petitioners shall pay the expenses of all U.S. witnesses.

(7) Petitioners shall have their employees submit to foreign jurisdiction without subpoena.

(8) Upon notification of the filing of Claimants' Complaint in Panama, the Clerk of Court is instructed to transfer to an escrow account in Panama the limitation fund deposited with the Court registry in this matter pursuant to the Stipulation for Cost Bond by Fantome, S.A. (D.E.6), filed April 2, 1999, and the Order Approving Ad Interim Stipulation (D.E.8), filed April 14, 1999.

(9) Subject to the above conditions, this case is **DISMISSED** without prejudice subject to Claimant's refiling it in the appropriate forum.

(10) Claimant's Motion for Summary Judgment (D.E.130) is **DENIED** as moot.

(11) This case is **CLOSED**.

(12) All pending motions not ruled upon by separate order are denied as moot.